FILED
NOV 20 2009
Clerk, U.S. District Court
District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 09-265 |
| | : | |
| | : | VIOLATION: 18 U.S.C. § 371 |
| v. | : | (Conspiracy to Defraud the United |
| | : | States and to commit Mail Fraud) |
| FEBE DURANGO RUEDA | : | |
| a/k/a FEBE DURANGO, | : | |
| | : | |
| Defendant. | : | |

## STATEMENT OF THE OFFENSE

1. Between at least November 2005 and approximately May 2007, FEBE DURANGO-RUEDA, a/k/a FEBE DURANGO ("DURANGO"), was the President of Droservicios, Ltda. ("Droservicios"). Droservicios was a company incorporated in 1992 in Colombia. From approximately November 2005 until approximately May 2007, DURANGO conspired with others to obtain from the Export-Import Bank of the United States ("Ex-Im Bank") a fraudulent loan guarantee to Droservicios, to falsify documents sent to United States banks and to the Ex-Im Bank, and to misappropriate approximately $1,332,081.65 in loan proceeds that were guaranteed by the Ex-Im Bank.

2. On November 14, 2005, Finex Trade Group, S.A. ("Finex Trade"), a Costa Rican company, delivered by the United States Postal Service, to the Ex-Im Bank on behalf of Droservicios an Application for Medium-Term Insurance or Guarantee ("Application"). The Application requested Ex-Im Bank to issue a guarantee on a loan from Finex Trade to Droservicios.

3. The Application represented that Finex Trade, as the "lender" in the transaction, intended to make a loan to Droservicios to enable the latter company to

purchase medical equipment meeting the Ex-Im Bank's definition of "United States goods," and have the equipment shipped to Colombia. The medical equipment that Droservicios represented to the Ex-Im Bank that it intended to purchase with the loan was identified in the Application. DURANGO knew at the time that the Application and other documents submitted to the Ex-Im Bank falsely stated that the equipment would be used to increase Droservicios' business of leasing medical equipment to public health institutions. In fact, DURANGO knew the equipment intended to be purchased with the loan proceeds would be used solely in a clinic in Cartagena, Colombia. This information was not submitted to or shared with transaction officials at the Ex-Im Bank.

4. With the Application, financial statements for Droservicios for fiscal years 2003 and 2004, and interim financial statements through June 30, 2005, were submitted to the Ex-Im Bank. DURANGO agreed with a co-conspirator ("CC-1") that the financial statements for Droservicios would be falsified to represent to the Ex-Im Bank that its financial condition was better than it really was. Knowing that the financial statements were fraudulent, and that the Ex-Im Bank would rely on the statements in determining whether to approve the Application, DURANGO signed the statements. DURANGO also induced a company bookkeeper and a public auditor to sign the fraudulent statements.

5. Financial statements for a borrower are reviewed by the Ex-Im Bank in connection with the bank's determination of whether to issue the requested loan guarantee. The Ex-Im Bank reviewed and relied upon Droservicios' false financial statements in making the determination to issue the requested guarantee on the loan to Droservicios. By letter dated April 5, 2006, the Ex-Im Bank notified Finex Trade of the

Droservicios loan guarantee approval. As structured, the total transaction amount was represented to be $1,362,085.88 and Finex Trade indicated that it intended to finance $1,228,281.00 of that amount.

6. The loan monies were not used to purchase any of the equipment represented to the Ex-Im Bank as being the intended use of the monies. Between approximately November 2005 and May 2007, DURANGO and other co-conspirators, including the supplier of the equipment ("CC-2"), and the exporter of the equipment, ("CC-3") agreed that other equipment that had not been identified to the Ex-Im Bank would be purchased and shipped to Droservicios. In or about June and July 2006, and in or about late 2006 or early 2007, DURANGO and Droservicios received equipment that had not been identified to the Ex-Im Bank.

7. Between approximately November 2005 and May 2007, DURANGO, CC-2 and CC-3 also agreed that a much smaller amount of the loan proceeds than was represented to the Ex-Im Bank would actually be used to purchase medical equipment for Droservicios. From in or about November 2005 until approximately May 2007, DURANGO and Droservicios received approximately $400,000 worth of equipment. The rest of the money was divided between cash payments to Droservicios – to be used for its business operations and building the clinic – and paid to other participants in the scheme, including CC-2 and CC-3, in fees and commissions. The Ex-Im Bank was not informed of these uses of the funds.

8. From approximately November 2005 until approximately May 2007, DURANGO agreed with other co-conspirators, including CC-2 and CC-3, to prepare and cause to be prepared invoices and shipping documents falsely representing the identity,

3

amount, and value of goods shipped to Droservicios. DURANGO and her co-conspirators made this agreement knowing that the false invoices and shipping documents would be submitted to the Ex-Im Bank in support of a claim for payment on the loan and would be the basis for certifications made to the Ex-Im Bank, also in support of a claim for payment on the loan, that the equipment identified to the Ex-Im Bank had been purchased and shipped.

9. On June 7, 2006, and on July 20, 2006, Finex Trade Group LLC ("Finex"), acting as the "exporter" in the transaction, submitted to the Ex-Im Bank a Form of Exporter's Certificate ("Exporter's Certificate"), representing that Finex had provided or would provide to the Ex-Im Bank copies of invoices describing the goods purchased with the loan proceeds and evidencing that the goods identified to the Ex-Im Bank and purchased with the loan proceeds were shipped to Colombia. CC-4 caused these Exporter's Certificates to be prepared and submitted to the Ex-Im Bank on the basis of the knowingly false invoices and shipping documents that DURANGO, CC-3 and CC-4 had prepared and agreed to cause to be prepared.

10. On August 30, 2006, Droservicios received at its bank account at a bank in Colombia a wire transfer of $99,064.00 of loan proceeds guaranteed by the Ex-Im Bank. In approximately December 2006, DURANGO received in Colombia $10,000 cash of loan proceeds guaranteed by the Ex-Im Bank. On February 23, 2007, DURANGO received at her bank account at a bank in Florida a wire transfer of $30,000 of loan proceeds guaranteed by the Ex-Im Bank.

11. Droservicios never made any of the required payments on the loan, which went into default. On May 3, 2007, the assignee of the loan submitted to the Ex-Im Bank

by the United States Postal Service a claim for payment on the defaulted loan. On May 17, 2007, not knowing that certifications and other representations made to the Ex-Im Bank were false and fraudulent, the Ex-Im Bank remitted payment to the assignee of the loan in the amount of $1,332,081.65.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

DATE: 11/20/09

_____
FEBE DURANGO-RUEDA
Defendant

_____
DAVID BOS, ESQ.
Attorney for Defendant